Danielle Leonard (SBN 218201)
Liren Ma (SBN 369197)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel.: (415) 421-7151
dleonard@altber.com
lma@altber.com

Jonathan Weissglass (SBN 185008)
LAW OFFICE OF JONATHAN WEISSGLASS
1939 Harrison Street, Suite 150-B
Oakland, CA 94612
Tel.: 510-836-4200
jonathan@weissglass.com

*Attorneys for Plaintiffs*
[Additional counsel listed on signature page]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO; AMERICAN FEDERATION OF STATE COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO; INTERNATIONAL FEDERATION OF PROFESSIONAL AND TECHNICAL ENGINEERS; NATIONAL FEDERATION OF FEDERAL EMPLOYEES, IAM, AFL-CIO; AFGE LOCAL 1122; AFGE LOCAL 1236; AFGE LOCAL 2110; AFGE LOCAL 3172, and NATIONAL TREASURY EMPLOYEES UNION,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OFFICE OF PERSONNEL MANAGEMENT; and SCOTT KUPOR, in his official capacity as Director of the U.S. Office of Personnel Management,<br><br>Defendants. | Case No. 3:26-cv-08835-VC<br><br>**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**INTRODUCTION**

1. This lawsuit challenges three Final Rules the U.S. Office of Personnel Management ("OPM") recently issued as part of a continuing quest to reshape the federal civil service contrary to Congress' design.

2. For decades, federal law has required that federal civil service employees must be hired, evaluated, and disciplined based on merit and protected against partisan reprisals and arbitrary actions, with very limited exceptions.

3. The current Donald J. Trump administration, however, seeks to weaken the long-standing legal framework that has helped ensure that talented civil servants seek federal employment and remain in that employment insulated from politically-driven decision-making, including terminations stemming from changes in presidential administrations. This campaign has taken many forms, including simply firing federal employees across the government (*AFGE v. OPM*, 799 F.Supp.3d 967 (N.D. Cal. 2025); *AFGE v. Trump*, 155 F.4th 1082 (9th Cir. 2025)), reclassifying thousands of federal employees to make it easier to fire them (91 Fed. Reg. 5580 (Feb. 6, 2026)), overhauling avenues for disputing and reviewing adverse employment actions (91 Fed. Reg. 49034 (Aug. 3, 2026); 91 Fed. Reg. 49230 (Aug. 3, 2026)), and eliminating collective bargaining rights and canceling collective bargaining agreements that provide negotiated grievance procedures for challenging certain employing agency actions (*AFGE v. Trump*, N.D. Cal. Case No. 25-cv-03070-JD; *AFGE Local No. 2305 v. U.S. Dep't of Veterans Affs.*, D.R.I. Case No. 25-cv-583-MRD-PAS).

4. Through various actions, the Trump administration has also sought to aggrandize OPM's role and authority far beyond that created and authorized by Congress, allowing OPM to usurp the role of agencies that employ federal employees and become the ultimate decision-maker.

5. OPM recently issued three Final Rules to continue these efforts. The first, issued on June 30, 2026, and known as the "Suitability Rule," seeks to avoid the specific procedures

and protections that Congress created for taking adverse actions against federal employees based on allegations of employee misconduct. *See* 91 Fed. Reg. 39361 (June 30, 2026).

6. In the Civil Service Reform Act of 1978 ("CSRA"), Congress established that most federal employees can be disciplined "only for such cause as will promote the efficiency of the service." 5 U.S.C. §7513(a). The CSRA affords those employees a specific process before the agency that seeks to discipline them, and the right to challenge significant disciplinary actions taken against them ("adverse actions"), such as removal from the federal service, before the Merit Systems Protection Board ("MSPB"), with judicial review by the U.S. Court of Appeals for the Federal Circuit. 5 U.S.C. §§7513(a), (b), (d), 7703. Congress created these protections to help ensure that the federal workforce is retained based on merit and not politics.

7. The Suitability Rule replaces the existing substantive and procedural protections for adverse actions taken by employing agencies with an OPM determination of "suitability" for service, transforming a process used previously to assess an individual's *pre-employment* character and conduct for initial admission into the federal service into an unfettered mechanism to police *post-appointment* misconduct and fire employees at OPM's will without any of the protections Congress intended.

8. Prior to this new Suitability Rule, federal law and OPM's existing regulations focused on procedures and criteria for employing agencies and OPM to consider pre-employment conduct. OPM did not take suitability actions based on post-appointment conduct. Discipline and other adverse actions taken by federal agencies based on conduct during employment were handled via well-established CSRA procedures, with opportunities for MSPB appeals and, ultimately, judicial review.

9. The Suitability Rule, however, radically transforms the use of "suitability" from a pre-employment screening system to a post-appointment removal mechanism, including by allowing OPM to assess and determine suitability of *current federal employees* based on their *post-appointment conduct*. OPM also now assumes the power both to remove employees from federal service based on post-appointment conduct and to prevent them from ever working for

the federal government again. And, because OPM has also issued a new rule barring employees fired through suitability actions from appealing to the MSPB and thereafter seeking review in the Federal Circuit, OPM also seeks to insulate its decisions to remove and bar employees from federal employment from independent review.

10. The impact of the Suitability Rule will be substantial: OPM itself estimates that half of all removal actions (previously addressed via CSRA procedures) will now become suitability actions taken by OPM.

11. The Suitability Rule directly conflicts with the governing substantive and procedural provisions of the CSRA and is unlawful.

12. The second rule at issue in this action, which pertains to performance appraisals and was issued on July 7, 2026 (*see* 91 Fed. Reg. 8780 (Feb. 24, 2026) (known as the "Performance Appraisal Rule"), runs counter to the requirements Congress expressly provided for performance appraisal systems.

13. Federal law requires employing federal agencies to create and use "performance appraisal systems" that "to the maximum extent feasible, permit the accurate evaluation of job performance on the basis of objective criteria . . . related to the job in question for each employee or position." 5 U.S.C. §4302(a), (c). Congress authorized OPM to create regulations for such performance appraisal systems only to the extent consistent with this requirement. 5 U.S.C. §4302(c).

14. Since OPM first issued performance appraisal regulations, it has prohibited agencies from imposing a forced distribution of performance ratings. After all, a forced distribution judges federal employees against *each other*, not against "objective criteria," as the statute requires.

15. But now OPM has abruptly reversed course. In the Performance Appraisal Rule, OPM gives itself the power to require federal agencies to use a forced distribution system to evaluate employees. This Rule directly conflicts with the governing provisions of the CSRA and is therefore unlawful.

16. The third rule this action challenges concerns reductions in force ("RIFs") used to eliminate positions in the federal workforce. This is known as the "RIF Process Rule" and was issued on August 3, 2026. *See* 91 Fed. Reg. 49178 (Aug. 3, 2026).

17. OPM has used the new rule to dramatically change the procedures federal agencies are required to use for any RIFs, including by changing the rules regarding retention preference and order. The new regulation violates statutorily-required preferences for veterans that Congress began enacting since soon after the Civil War, excludes employees from statutory coverage, and permits agencies to engage in RIFs *without* applying statutory retention order requirements at all. In general, OPM is again elevating its view of performance above all other factors, and is attempting to remove obstacles to terminating employees without the protections required by Congress.

18. All three rules are contrary to statutory authority and design and exceed the authority delegated to OPM by statute.

19. All three rules also represent arbitrary and capricious reversals of long-standing procedures and policies, based on impermissible considerations and without consideration of important factors. They further lack a rational connection between the reasons given and the actions taken. They therefore violate the Administrative Procedure Act ("APA"), 5 U.S.C. §706, and will undermine existing statutory protections for federal employees and the merit-based civil service itself, opening the door to political and personal favoritism and degrading the quality of the workforce, contrary to the CSRA.

20. Plaintiffs are unions that collectively represent more than a million federal employees who will now be subject to unlawful suitability actions, performance appraisals, and RIF procedures. Plaintiffs ask the Court to uphold Congress' design and hold unlawful and set aside all three Final Rules as contrary to law, in excess of statutory authority, and arbitrary and capricious under the APA, 5 U.S.C. §706.

**JURISDICTION AND VENUE**

21. This Court has jurisdiction pursuant to 28 U.S.C. §1331.

22. Venue is appropriate in this district under 28 U.S.C. §1391(e). Plaintiffs represent federal employees whose place of employment and/or residence is within the Northern District of California.

23. Intradistrict assignment is appropriate in the San Francisco/Oakland division of this Court.

**PARTIES**

24. Plaintiff American Federation of Government Employees, AFL-CIO ("AFGE"), is a labor organization and unincorporated association headquartered in Washington, D.C. AFGE, the largest union of federal employees, represents approximately 800,000 federal civilian employees through its affiliated councils and locals at 192 Departments, agencies and sub-agencies of the federal government, and in every state in the United States. AFGE members include nurses caring for our nation's veterans, analysts helping small businesses get loans, researchers supporting our nation's schools, scientists conducting critical research, health care workers serving on military bases, civilian employees in the Department of Defense supporting our military personnel and their families, and employees of the Social Security Administration making sure retirees receive the benefits they have earned. AFGE's representation regularly includes the direct representation of federal employees in employment related matters before federal courts and administrative agencies, including the MSPB. AFGE brings this lawsuit on behalf of itself and the federal employees it represents.

25. Plaintiff American Federation of State County and Municipal Employees, AFL-CIO ("AFSCME"), is a labor organization and unincorporated association headquartered in Washington, D.C. AFSCME is the largest trade union of public employees in the United States, with 1.4 million members organized into approximately 3,400 local unions, 58 councils, and other affiliates in 46 states, the District of Columbia, and Puerto Rico. AFSCME, through its subordinate body District Council 20 and its constituent local unions, represents federal civilian employees in numerous agencies and departments across the federal government. AFSCME's members working for the federal government make our communities stronger, healthier, and

safer by working to ensure aviation safety at the Federal Aviation Administration, agricultural sustainability at the Department of Agriculture, criminal justice through the Department of Justice, and more. AFSCME brings this lawsuit on behalf of itself and the federal employees it represents.

26. Plaintiff International Federation of Professional & Technical Engineers, AFL-CIO ("IFPTE"), is an international labor organization headquartered in Washington, DC, that represents over 90,000 professional and technical workers in professions such as scientists, researchers, analysts, and engineers. IFPTE represents approximately 30,000 federal sector employees working across the nation at multiple agencies, such as at the Environmental Protection Agency's Region 9 Headquarters in San Francisco, California, and several components of the Department of Defense, including civilian employees of the U.S. Army Corps of Engineers in San Francisco, California. IFPTE brings this lawsuit on behalf of itself and the federal employees it represents.

27. Plaintiff National Federation of Federal Employees, IAM, AFL-CIO ("NFFE"), is an unincorporated association headquartered in Washington, D.C. NFFE, the nation's first federal union, is a national labor union representing approximately 110,000 professional and non-professional federal government workers across the United States. NFFE is an affiliate of the International Association of Machinists and Aerospace Workers ("IAM"). NFFE and its affiliates represent employees at numerous departments and agencies across the federal government, including in San Francisco, Oakland, and the greater Bay Area. NFFE brings this lawsuit on behalf of itself and the federal employees it represents.

28. Plaintiff AFGE Local 1122 is a labor organization in Richmond, California. AFGE Local 1122 represents over 700 employees at a Social Security Administration Western Program Service Center in Richmond, California, in addition to other units within the Social Security Administration's San Francisco, Seattle, and Denver regions. Those employees work in positions including but not limited to Claims Technical Experts, Claims Specialists, Benefits

Authorizers, and other clerical staff. AFGE Local 1122 brings this lawsuit on behalf of itself and the federal employees it represents.

29. Plaintiff AFGE Local 1236 is a labor organization and unincorporated association headquartered in San Francisco, California. AFGE Local 1236 represents attorney-advisors at Environmental Protection Agency Region 9 Headquarters in San Francisco, California, and EPA's National Center for Radiation Field Operations in Las Vegas, Nevada. AFGE Local 1236 brings this lawsuit on behalf of itself and the federal employees it represents.

30. Plaintiff AFGE Local 2110 is a labor organization and unincorporated association headquartered in Palo Alto, California. AFGE Local 2110 represents approximately 4,800 employees at the Department of Veterans' Affairs Palo Alto Health Care System, including its Menlo Park and Livermore Divisions, and at several Community-Based Outpatient Clinics in Fremont, San José, Monterey, and Capitola. Those employees work as doctors, nurses, emergency medical services personnel, food service workers, custodial staff, and administrative staff. AFGE Local 2110 brings this lawsuit on behalf of itself and the federal employees it represents.

31. Plaintiff AFGE Local 3172 is a labor organization and unincorporated association headquartered in Pacifica, California. AFGE Local 3172 represents approximately 1,600 employees at Social Security Administration field offices in California and Nevada. Those employees work in positions including Claims Services Representatives, Claims Specialists, Technical Experts, and other administrative and facilities staff. AFGE Local 3172 brings this lawsuit on behalf of itself and the federal employees it represents.

32. Plaintiff National Treasury Employees Union ("NTEU") is a labor organization and unincorporated association headquartered in Washington, D.C. NTEU is the second largest union of federal workers. It represents federal employees in 38 federal departments and agencies, including employees in San Francisco, California. NTEU's core activities include negotiating collective bargaining agreements with agency employers, advocating for bargaining

unit employees, and litigating disputes involving federal employees' rights. NTEU brings this lawsuit on behalf of itself and the federal employees it represents.

33. Defendant OPM is a federal agency headquartered in Washington, D.C. OPM is a federal agency within the meaning of the APA, 5 U.S.C. §551(1).

34. Defendant Scott Kupor is the Director of OPM. He approved the Final Rules this lawsuit challenges. He is sued in his official capacity.

## BACKGROUND

### Protections For The Merit-Based Federal Civil Service

35. In 1978, Congress enacted the Civil Service Reform Act to "provide the people of the United States with a competent, honest, and productive Federal work force" by ensuring that federal employment is "consistent with merit system principles and free from prohibited personnel practices." Pub. L. No. 95-454, §3(1), 92 Stat. 1112 (1978).

36. To help accomplish these goals, the CSRA provided substantive and procedural protections for employees across the federal government. In general, federal civil service employees are classified into different categories, with different applicable substantive and procedural provisions. Most federal employees are in the "competitive service." 5 U.S.C. §2102(a). Other federal employees are in the "excepted" service, Senate-confirmed positions, and the Senior Executive Service. 5 U.S.C. §2102(a)(1).

37. The CSRA establishes nine "merit system principles" for personnel management, including "fair and equitable treatment in all aspects of personnel management without regard to political affiliation" or other improper factors, employee retention "on the basis of the adequacy of their performance," and "protect[ion] against arbitrary action." 5 U.S.C. §2301(b)(2), (b)(6), (b)(8). Beyond those general principles, the CSRA sets forth many specific substantive and procedural requirements for the regulation of federal employment and federal employment decisions by employing agencies.

38. Chapter 75 of the CSRA sets forth substantive and procedural protections for both competitive service and excepted service employees against adverse actions. A covered

"employee" in Subchapter II – meaning an individual who has earned these statutory due process protections – includes individuals who have been in the competitive service for at least a year and are not in a probationary or trial position as well as excepted service employees who have completed one or two years of service depending on the nature of their employment. 5 U.S.C. §7511(a)(1). Certain categories of employment, such as political appointees, are exempted. 5 U.S.C. §7511(b).

39. Significantly, Chapter 75 imposes a for cause standard for taking adverse disciplinary action against covered employees: "[A]n agency may take an action covered by this subchapter against an employee only for such cause as will promote the efficiency of the service." 5 U.S.C. §7513(a). An "action" includes removal from employment. 5 U.S.C. §7512(1).

40. The CSRA also confers significant procedural protections for covered federal employees before their employing federal agencies can take adverse actions. The protections Congress afforded include notice, an opportunity to respond orally and in writing, the right to representation, the right to appeal to the MSPB, and thereafter review by the U.S. Court of Appeals for the Federal Circuit. 5 U.S.C. §§7513(b), (d), 7703.

41. The CSRA separately contains provisions pertaining to agency evaluation of federal employee performance. In particular, Congress has required each federal agency to create and use performance evaluation systems and imposed substantive requirements for those systems, including that employees be evaluated based on objective criteria. 5 U.S.C. §4302(a), (c).

42. Congress also at times has delegated to the President or to OPM the authority to adopt regulations consistent with the requirements of the CSRA for specific aspects of federal employment.

43. For instance, the CSRA defines the authority of OPM and its Director, including on aiding and advising the President on rules pertaining to "an efficient civil service and a systematic application of the merit system principles" and on "executing, administering, and

enforcing" the laws and rules pertaining to the civil service other than those Congress assigned to the MSPB. 5 U.S.C. §1103(a)(5), (7). Any rules issued by OPM are expressly subject to the requirements of the APA, notwithstanding the APA's exclusion of personnel-related matters. 5 U.S.C. §§1103(b), 1105.

44. With respect to suitability in particular, prior to the enactment of the CSRA, Congress gave the President authority to establish rules governing the *admission* of individuals into the civil service. 5 U.S.C. §3301.

45. Pursuant to its delegated rule-making authority, OPM previously adopted government-wide regulations pertaining to suitability assessments for candidates for federal employment, which are generally set forth at 5 C.F.R. Part 731. The new Suitability Rule purports to amend these provisions.

46. With respect to performance appraisal systems, although Congress delegated OPM the authority to issue implementing regulations, Congress set forth substantive, statutory requirements and restrictions on agencies' evaluation of employees' performance with which those regulations must comply. 5 U.S.C. §4302(c).

47. Prior to the new Performance Appraisal Rule, OPM had issued implementing regulations pertaining to these systems. 5 C.F.R. Part 430. The new Performance Appraisal Rule purports to amend these provisions.

**Retention Preference For Veterans**

48. For 150 years, Congress has protected veterans during federal workforce reductions. The first such retention preference statute was enacted in 1876 with various changes being made over the years. *See, e.g.*, Ch. 287, §3, 19 Stat. 143, 169 (Aug. 15, 1876); Veterans' Preference Act of 1944, Pub. L. No. 78-359, §12, 58 Stat. 390 (predecessor of 5 U.S.C. §3502); *Hilton v. Sullivan*, 334 U.S. 323, 336-39 (1948) (addressing veteran preference).

49. The current statutory scheme for retention preference procedures during RIFs is contained in 5 U.S.C. §§3501-04. The statute applies to all employees of federal agencies unless expressly exempted. 5 U.S.C. §§3501, 3504. The statute authorizes OPM to create "order of

retention" regulations, which must give "due effect" to four enumerated factors: tenure, military service, length of service, and performance ratings. 5 U.S.C. §3501(a)(1)-(4). Congress also required that employees (and their labor representatives) be given advance notice of the release of an employee through workforce reduction, and that the notice "shall" include, *inter alia*, "the employee's ranking relative to other competing employees, and how that ranking was determined." 5 U.S.C. §3502(d)(2)(D).

50. The statute provides the strongest protection for veterans. Congress provided as follows in 5 U.S.C. §3502(c): "An employee who is entitled to retention preference and whose performance has not been rated unacceptable under a performance appraisal system implemented under chapter 43 of this title is *entitled to be retained in preference to other competing employees*." (Emphasis added.) This subsection covers veterans. *See* 5 U.S.C. §§2108(3), 3501(a)(3); 91 Fed. Reg. 10904, 10905 (Mar. 5, 2026); 91 Fed. Reg. at 49182.

51. Further, within the category of veterans, Congress provided: "A preference eligible described in section 2108(3)(C) of this title who has a compensable service-connected disability of 30 percent or more and whose performance has not been rated unacceptable under a performance appraisal system implemented under chapter 43 of this title is entitled to be retained in preference to other preference eligibles." 5 U.S.C. §3502(b). That is, disabled veterans have even more of a preference than other veterans.

**The Suitability Rule**

52. On June 3, 2025, OPM issued a Proposed Rule entitled "Suitability and Fitness." 90 Fed. Reg. 23467 (June 3, 2025).

53. Plaintiffs AFGE, AFSCME, NFFE, and NTEU submitted comments opposing the Proposed Rule, including on the grounds that it exceeds and is contrary to statutory authority.

54. On June 30, 2026, OPM issued the Final Rule entitled "Suitability and Fitness." 91 Fed. Reg. 39361 (June 30, 2026) (herein, the "Suitability Rule").

55. This Suitability Rule took effect on July 30, 2026. 91 Fed. Reg. at 39361.

56. The Suitability Rule seeks to dramatically enlarge the use of "suitability actions" to take adverse actions against incumbent federal employees, including for post-appointment conduct, outside of the protections Congress afforded under Chapter 75 for adverse actions.

57. "Suitability actions" are negative employment actions (including cancellation of eligibility for employment, removal from employment, and debarment from federal employment in the future) taken by OPM or an agency against individuals based on broad factors, such as dishonesty and other conduct. 5 C.F.R. §§731.202, 731.203.

58. Prior to the adoption of the Suitability Rule, OPM did not take suitability actions with respect to post-appointment conduct. Instead agencies could take adverse actions consistent with their employment authority and subject to Chapter 75. 91 Fed. Reg. at 39362-63.

59. Under the Suitability Rule, suitability actions are authorized for applicants and appointees (*i.e.*, those seeking federal employment) *and* incumbent employees. 5 C.F.R. §§731.103(g), 731.203(d), (e). These actions are authorized for competitive service employees as well as those excepted service positions that can be noncompetitively converted to competitive service positions (and separately for career Senior Executive Service employees). 5 C.F.R. §§731.101(a), 731.203.

60. With respect to applicants and appointees, the Suitability Rule delegates suitability actions to the employing agencies, just as OPM's regulations did prior to the Suitability Rule. 5 C.F.R. §731.103(a). But with respect to employees, OPM retains for itself "sole jurisdiction" to take suitability actions in certain circumstances, including, significantly, for "post-appointment conduct." 5 C.F.R. §731.103(g).

61. The Suitability Rule provides that OPM's Director or his designee will make suitability action decisions. 5 C.F.R. §731.304(a). If OPM requires an employee to be removed, the agency must remove the employee within 5 business days. 5 C.F.R. §731.304(b).

62. There are no requirements or standards for determining *who* at OPM is authorized to make decisions regarding suitability actions, nor is that information public. OPM's website currently claims: "OPM's Suitability Executive Agent Programs (SuitEA) serves as the Federal

Government's suitability and fitness authority." Https://www.opm.gov/suitability/. OPM provides no further information regarding who comprises "SuitEA" (which is not a subcomponent created or regulated by statute or regulation).

63. OPM concedes that "some suitability actions for post-appointment misconduct may be actions that would have previously been processed under Chapter 75" and that "the process an individual receives may be different than what the individual would have received under Chapter 75." 91 Fed. Reg. at 39372. As OPM states in its July 30, 2026 Suitability and Fitness Manual (available at: https://www.opm.gov/media/up1ff1ev/sfpm-7302026.pdf): "Before this amendment, when a federal employee engaged in serious misconduct on the job, agencies generally had to use a different authority such as a Chapter 75 action to address the conduct."

64. OPM's new process will be applicable to a substantial portion of the approximately two million federal employees. OPM estimates that *half* of the actions to remove employees will be shifted from Chapter 75 to suitability actions. 91 Fed. Reg. at 39376.

65. As a result of this Suitability Rule, OPM assumes authority that Congress has never granted it by statute to make disciplinary decisions (including termination) with respect to federal civil service employees based on OPM's assessment of conduct during employment. Moreover, those decisions will be made by an unnamed set of individuals within OPM, using an opaque process that OPM itself will then purport to "review."

66. With respect to process, Chapter 75 adverse actions must be made by the agency that employs the employee in question. 5 U.S.C. §§7513(a). Suitability actions, however, can be taken by OPM; and with respect to post-appointment conduct, *must* be taken by OPM. *E.g.*, 5 C.F.R. §731.103(b), (c), (e)-(g).

67. Chapter 75 adverse actions further provide employees the right to be heard orally. 5 U.S.C. §7513(b)(2). Suitability actions do not afford this right. 5 C.F.R. §731.303(a).

68. Also as to process, and perhaps most critically, Chapter 75 gives employees the right to appeal adverse actions taken against them to the MSPB (5 U.S.C. §7513(d)) and, in the event of an unfavorable MSPB decision, to seek judicial review by the Court of Appeals for the

Federal Circuit (5 U.S.C. §7703). But OPM has also recently replaced MSPB appeals and judicial review by the Federal Circuit with purported "review" by OPM itself – even where OPM took the initial suitability action. 91 Fed. Reg. 49034, 49066 (new 5 C.F.R. §731.501) (Aug. 3, 2026). Because an employee can only appeal a suitability action with OPM itself, the same agency (OPM): (1) establishes the use of suitability actions for removing employees, (2) takes such actions against employees, and (3) purports to determine whether its own actions were proper. In short, OPM has granted itself plenary and, in its view, unreviewable authority to fire employees across the government. It is hard to imagine a scheme that is more contrary to Congress' design.

69. Because the factors OPM will employ to make these suitability decisions are broad and subjective (5 C.F.R. §731.202), they can readily be applied for political reasons or otherwise in bad faith, in a manner that Chapter 75 adverse actions were deliberately meant to avoid. Centralizing decisions in OPM occurs against a backdrop in which the current presidential administration has politicized OPM in an unprecedented manner and used it to carry out many of the Trump Administration's most dangerous efforts to politicize the civil service.

70. No statute authorizes the Suitability Rule or the authority that OPM assumes here to supersede the requirements of Chapter 75.

71. OPM justifies the need for suitability actions instead of Chapter 75 adverse actions largely on the ground that the former allow debarment, thereby preventing an employee from taking a job at another agency. 91 Fed. Reg. at 39368. OPM does not explain how one agency would miss that an individual had been removed from employment by another agency in making a hiring decision even without debarment. Nor is the Suitability Rule limited to permitting debarment of employees – it also includes removing incumbent employees in the first instance. 5 C.F.R. §§731.101(a), 731.203(g), 731.304(b), 731.404(b). That remedy is squarely covered by Chapter 75 adverse actions. 5 U.S.C. §7512(1). The purported need for debarment cannot justify the entire Suitability Rule. Further, OPM fails to explain why, if a suitability action is indeed needed to debar an individual, OPM could not take such an action if and when

an individual previously removed by an agency pursuant to Chapter 75 applied for new federal employment.

72. OPM also asserts as justification for expanding suitability actions to post-appointment conduct that this is a better means of holding employees accountable than Chapter 75 adverse actions. 91 Fed. Reg. at 39368-69. This is just another way of saying that OPM disagrees with Congress; this purported justification does not support the Suitability Rule.

73. OPM further asserts that agencies often choose not to act against employees due to Chapter 75 procedures, citing a survey showing "only 41 percent of supervisors are confident they could remove an employee who committed serious misconduct." 91 Fed. Reg. at 39369. But OPM has not shown that the procedures provided by Chapter 75 were the reason for that statistic or how that could be the case if 41 percent were confident under the same procedures.

74. OPM similarly asserts that agencies are frustrated about not being able to take suitability actions against employees for post-appointment conduct. 91 Fed. Reg. at 39363, 39375. But Congress required the substantive and procedural protections of Chapter 75 and OPM again disagrees. There are even expedited procedures for removing employees reasonably believed to have committed crimes. 5 U.S.C. §7513(b)(1).

75. OPM also justifies the Suitability Rule by claiming, "illogically, the Government has far greater ability to bar someone from Federal employment who has committed a serious crime or misconduct in the past than it does to remove someone who engages in the exact same behavior as a Federal employee." 91 Fed. Reg. at 39363 (emphasis deleted). This again simply demonstrates OPM's disagreement with Congress. It is not illogical for Congress to grant greater civil service protections to incumbent employees than to applicants.

76. In response to significant concerns that the Suitability Rule will have an adverse effect on hiring and retention, OPM dismisses the concern about the loss of appeal rights as a "fundamental misunderstanding of OPM's proposals." 91 Fed. Reg. at 39374. In support, OPM refers to a discussion where "OPM notes that it proposed no changes to the right to appeal a suitability action contained in subpart E in this rulemaking." 91 Fed. Reg. at 39371. OPM made

that statement on June 30, 2026. 91 Fed. Reg. at 39361. But almost five months earlier on February 6, 2026, OPM had proposed to eliminate an employee's right to appeal a suitability action to the MSPB (and thereafter the Federal Circuit) and instead replace that with an appeal to OPM itself. 91 Fed. Reg. 5352, 5353 (Feb. 6, 2026). That proposal is now final as discussed above in paragraph 68. Consequently, what OPM contends is a "fundamental misunderstanding" actually shows OPM's attempt to mislead about the effects of the Suitability Rule.

77. OPM further claims that the Suitability Rule will improve "public confidence" but offers no evidence. 91 Fed. Reg. at 39374.

78. OPM also does not explain the incoherence of its Suitability Rule as it relates to excepted service employees. As OPM's regulations acknowledge, it has no authority to take a suitability action against excepted service employees (unless they occupy a position that can be converted to the competitive service). *See* 5 C.F.R. §§731.101(a), 731.203. The result of the Suitability Rule is that excepted service employees – to whom Congress has historically granted fewer rights than competitive service employees – all of a sudden could only be removed under Chapter 75 for the same post-appointment conduct for which a competitive service employee could be more easily removed by a suitability action.

79. Nor does OPM justify the standardless nature of its authority to bring suitability actions. For instance, "OPM may, in its discretion, exercise its jurisdiction under this part in any case it deems necessary regardless of whether the agency may adjudicate under another authority." 5 C.F.R. §731.103(g). This is an invitation for selective enforcement meant to punish certain behaviors and allow other, similar behaviors – such as political speech.

**The Performance Appraisal Rule**

80. On February 24, 2026, OPM issued a Notice of Proposed Rulemaking for a Rule entitled "Performance Appraisal for General Schedule, Prevailing Rate, and Certain Other Employees." 91 Fed. Reg. 8780 (Feb. 24, 2026).

81. Plaintiffs AFGE, AFSCME, and NTEU submitted comments opposing the proposed Rule, including on the grounds that it exceeds and is contrary to statutory authority.

82. On July 7, 2026, OPM issued the Final Rule entitled "Performance Appraisal for General Schedule, Prevailing Rate, and Certain Other Employees." 91 Fed. Reg. 41521 (July 7, 2026) (herein, the "Performance Appraisal Rule").

83. This Performance Appraisal Rule took effect on August 6, 2026. 91 Fed. Reg. at 41521.

84. In promulgating the Performance Appraisal Rule, OPM concedes: "The Civil Service Reform Act (CSRA) of 1978 established a new framework for merit-based personnel management in the Federal Government, including reforms to the performance appraisal system for Federal employees." 91 Fed. Reg. at 41521.

85. In particular, Congress mandated that each federal agency develop performance appraisal systems and "use the results of performance appraisals as a basis for training, rewarding, reassigning, promoting, reducing in grade, retaining, and removing employees." 5 U.S.C. §4302(a)(3).

86. 5 U.S.C. §4302(c)(1) provides that these performance appraisal systems must include "performance standards which will, to the *maximum extent feasible*, permit the *accurate* evaluation of job performance on the basis of *objective* criteria." (Emphases added.)

87. OPM implemented Congress' mandate in 1983 and made modifications in the 1990s. 91 Fed. Reg. at 41521.

88. Under OPM's regulations as they existed for decades prior to the recent Performance Appraisal Rule, federal agencies appraised the performance of its employees by assigning a "summary level" on a scale of 1-5 and "[t]he method for deriving and assigning a summary level may not limit or require the use of particular summary levels (*i.e.,* establish a forced distribution of summary levels)." 5 C.F.R. §430.208(c) (repealed Aug. 6, 2026).

89. In other words, under the longstanding prior system, employees' summary levels for their performance were determined irrespective of the relative performance of their peers. It was possible for all employees in a particular department or team to get the best summary level if

they were all superb, just as it was possible for all employees to get the worst summary level or anything in between.

90. OPM seeks to eliminate such outcomes based on actual employee performance under the Performance Appraisal Rule. Rather than looking only at the performance of a particular employee against objective criteria as required by statute, OPM's regulations now provide that "OPM may establish, and refine as needed, a standardized distribution of some or all rating levels which agencies must apply when rating employees." 5 C.F.R. §430.208(c). This can "involve comparing, categorizing, and ranking employees or groups on the basis of their performance." 5 C.F.R. §430.208(d).

91. This change means that under the Performance Appraisal Rule OPM can require agencies to appraise their employees based on a forced curve such that agencies must differentiate between employees who previously would have received the same summary level. The result is that objective criteria such as actual performance will no longer be the sole basis of evaluations and those evaluations will not be accurate contrary to 5 U.S.C. §4302(c)(1). Instead, employee evaluations will depend on how employees compare to each other.

92. The result will cause problems. For instance, a small team with only high performers will need to rank some as less high performers. Further, if two employees have the same objective performance rating and the new "distribution" requires that they receive different summary levels, this is an invitation for favoritism based on subjective and impermissible factors. OPM has not shown that more dispersed evaluations are also more accurate and objective or that the use of objective criteria is no longer feasible.

93. OPM claims that it "intends" to apply the forced distribution only to the two highest summary levels and not to the lower summary levels. 91 Fed. Reg. at 41524. The regulation as written, however, applies more broadly to "some or all rating levels." 5 C.F.R. §430.208(c). Because the regulation is not ambiguous, OPM's purported intent does not alter the legal analysis. *See, e.g.*, *Christensen v. Harris Cnty.*, 529 U.S. 576, 588 (2000).

94. OPM justifies forced distribution on the ground that high employee ratings are inflated. 91 Fed. Reg. at 41521-22. Indeed, OPM discounts literature and experience showing adverse consequences from forced distribution on the purported ground that inflated employee ratings are worse. 91 Fed. Reg. at 41525-26. But OPM does not seriously consider or rebut other possibilities, such as that high employee ratings are deserved.

95. The Performance Appraisal Rule is also inconsistent with how Congress structured grievance procedures. The CSRA requires agencies to negotiate in good faith with the exclusive representative of their employees to reach a collective bargaining agreement. 5 U.S.C. §7114(b)(1). Congress further provided that "any collective bargaining agreement shall provide procedures for the settlement of grievances." 5 U.S.C. §7121(a)(1). Congress allowed only one exception: "Any collective bargaining agreement may exclude any matter from the application of the grievance procedures which are provided for in the agreement." 5 U.S.C. §7121(a)(2). There is no statutory exception for OPM to limit the scope of the grievance process through a rulemaking.

96. Grievances about performance evaluations are subject to the requirements in the previous paragraph for at least two reasons.

97. First, Congress defined the term "grievance" broadly to include "any complaint" made "by any employee concerning any matter relating to the employment of the employee." 5 U.S.C. §7103(a)(9). Performance evaluations relate to employment.

98. Second, Congress provided that actions taken against an employee based on "unacceptable performance" – defined as the failure to meet performance standards (5 U.S.C. §4301(3)) – may be grieved if covered by the negotiated grievance procedure. 5 U.S.C. §§4303, 7121(e). Performance evaluations would be encompassed in such a grievance.

99. Yet OPM has eliminated the ability to grieve a performance evaluation once existing collective bargaining agreements expire. 91 Fed. Reg. at 41531-32; 5 C.F.R. §430.208(k); 5 U.S.C. §7116(a)(7).

100. Among the reasons OPM provided for eliminating grievances on performance evaluations is an assertion without any evidence that grievance arbitrators are not well-suited to deciding performance evaluation issues. 91 Fed. Reg. at 41532. This assertion is contrary to the long history of arbitrators hearing such issues.

101. The Performance Appraisal Rule also eliminates the requirement for review and approval by higher level management of performance appraisals resulting in the lowest summary level. 91 Fed. Reg. at 41530-31 (former 5 C.F.R. §430.208(e)).

102. Higher-level review provides an important check against unsupported determinations of unacceptable performance.

103. OPM argues that agencies retain discretion to use review processes but provides no guidance about how that discretion should be used. 91 Fed. Reg. at 41530.

104. OPM also argues that higher-level review "adds unnecessary complexity, delays corrective action, and may be redundant in streamlined agency structures." 91 Fed. Reg. at 41530. But OPM admits that "only approximately 0.1 percent of employees" receive the lowest summary level. 91 Fed. Reg. at 41530. If that percentage remains small under the Performance Appraisal Rule, it will not take much time or effort to maintain higher-level review. If, however, that percentage is going to increase, OPM nowhere explains why higher-level review is so complex that it should be jettisoned or how much time is expected to be saved based on how much of an increase is projected.

105. OPM is implementing the Performance Appraisal Rule. On September 21, 2026, Defendant Kupor issued a Memorandum to Department and Agency Heads, which applied the new forced distribution to the two highest summary levels and set a cap on those ratings of 40 percent for the 2026 Fiscal Year with limited exceptions.

**The RIF Process Rule**

106. On March 5, 2026, OPM issued a Notice of Proposed Rulemaking for a Rule entitled "Reduction in Force." 91 Fed. Reg. 10904 (Mar. 5, 2026).

107. Plaintiffs AFGE, AFSCME, and NTEU submitted comments opposing the proposed Rule, including on the grounds that the proposed regulation exceeds and is contrary to statutory authority in a variety of ways.

108. On August 3, 2026, OPM issued the Final Rule entitled "Reduction in Force." 91 Fed. Reg. 49178 (Aug. 3, 2026) (herein, the "RIF Process Rule").

109. The RIF Process Rule took effect on September 2, 2026. 91 Fed. Reg. at 49178. That same day, OPM issued a Memorandum, "Final Regulations on Reduction in Force," to all Heads of Departments and Agencies regarding the new regulation.

110. OPM summarized the final rule as follows: "The Office of Personnel Management (OPM) is revising its reduction in force (RIF) regulations to make the RIF regulations more streamlined, efficient, and merit-based by prioritizing performance over tenure and length of service when determining which employees will be retained in a RIF and by modifying the types of employees who are excluded from RIF competition." 91 Fed. Reg. at 49178. This description is inaccurate: rather than simply prioritizing performance, for most employees subject to RIFs, OPM's new rule in effect renders the other statutorily required factors (including veterans' status, tenure, and length of service) irrelevant, and for some categories of employees that Congress did intend to be covered by these procedures, OPM now renders the retention procedures entirely irrelevant.

111. As statutory authority for the new Rule, OPM cited, *inter alia*, 5 U.S.C. §3502. But the RIF Process Rule is contrary to the statute, exceeds OPM's authority, and is arbitrary and capricious in several ways.

112. First, the RIF Process Rule is contrary to the congressionally-mandated preference for veterans in §3502.

113. As OPM summarizes the Rule, it "[r]eorders retention standing to place performance first." 91 Fed. Reg. at 49178 (emphasis deleted). Performance will only be "augmented by veterans' preference." *Id.* The reality is that for most veterans subject to a RIF OPM's new regime ensures that veteran status will not result in preference over other employees

subject to the RIF. And for employees OPM now excludes by regulation from these procedures, OPM ensures that veteran status is not given preference at all.

114. The statute requires veterans to be given preference during any RIF as long as their performance has not been rated unacceptable. 5 U.S.C. §3502(c). But the new regulation creates a new points system by which performance is much more heavily-weighted than veteran status, such that a veteran whose performance has *not been rated unacceptable* will *not* be retained before an employee to whom higher performance points have been given. *Id*.

115. In responding to comments in the final RIF Process Rule, OPM defends its new rank order largely by claiming the prior regulation was not required by statute and that it is not *eliminating* credit for veterans status. But the statute requires that a veteran "whose performance has not been rated unacceptable under a performance appraisal system implemented under chapter 43 of this title is *entitled* to be retained in preference to other competing employees." 5 U.S.C. §3502(c) (emphasis added). OPM's only response is to assert that the statute means something other than what it unambiguously says: that veterans with anything other than unacceptable ratings must be retained before other competing employees. In addition to being contrary to the plain language of the statute, OPM's explanation is neither reasonably explained nor reasonable because it simply ignores what Congress plainly required. This position, in reliance on an incorrect legal interpretation and in defiance of congressional direction, both exceeds OPM's authority and is arbitrary and capricious.

116. Second, the new system for ranking employees according to performance largely eliminates consideration of the other statutory factors of tenure and length of service for most employees. These factors, as OPM admits, will be used *only* to break ties resulting from the ranking system predicated on performance alone. Congress, however, required OPM to give "due effect" for each of these factors when ranking employees, and OPM's system, in which most employees' tenure or length of service will never be considered, is contrary to law.

117. OPM contends that Congress gave it the unfettered discretion to determine what weight or value to put on each of the four factors in designing these regulations. OPM ignores

that under its system, most employees will not have *any* weight given to some of the required factors. Even to the extent OPM has some discretion to design the system that gives weight to these factors, the administration's objective of elevating performance at the almost complete expense of other factors ignores what Congress intended OPM to consider and is neither reasonable nor reasonably explained.

118. Third, the RIF Process Rule is also contrary to congressional direction to apply retention preference rules to "each employee in or under an Executive agency" unless "otherwise provided by this subsection and section 3504 of this title." 5 U.S.C. §3501(b). Instead, OPM has now revised the regulations to exclude large numbers of employees from the application of retention preference and the RIF rules in general. 91 Fed. Reg. at 49178 ("Excludes certain employees from RIF competition.").

119. Notably, the excluded employees include categories of employees that have been recently hired by this administration and lack tenure or length in service as compared to employees that *would* be included in a RIF. These exclusions violate the scope of the statute, but also violate the statute in a further way: by permitting agencies to keep in these excluded positions while engaged in a RIF of more experienced employees and veterans, OPM is again violating the mandated use of retention order and veterans' preference. By manipulating the use of exclusions to give an advantage to individuals hired under this administration, OPM is violating the statute.

120. OPM's justification for narrowing the categories of federal employees subject to retention preference is to ignore the scope and application of the "subchapter" language in 5 U.S.C. §3501(b), and claim authority to define "competing employees" in §3502. That explanation defies the plain language of the statute in directing OPM to apply *the subchapter* to *all* employees unless Congress expressly exempted them. Under OPM's rules, an employee with decades of experience can accept a new position (and therefore be probationary in that position) and be released without application of retention preference. Likewise, under OPM's rules, a brand new employee can be retained when far more experienced veterans are released through a

RIF. All of this violates the statute, and OPM's explanation for these exclusions is neither reasonable nor reasonably explained.

121. Fourth, the RIF Process Rule is also contrary to statutory direction to apply retention preference rules to all workforce reductions via the manipulation of the "competitive areas" used to define RIFs. OPM has revised the rule to permit agencies to exempt themselves from any application of retention preference if they simply define the "competitive area" for purposes of the RIF contiguously with the positions to be eliminated. This is a loophole wide enough to swallow the entire rule.

122. Specifically, OPM explains that "[u]nder this rule, competitive areas may be based on official organizational units or combinations of units." 91 Fed. Reg. at 49178. OPM further explains that the Rule "[c]larifies and simplifies procedures when an entire competitive area is being abolished. *When abolishing all positions in a competitive area* within 180 days, agencies may release employees *without ranking them on a retention register or applying assignment rights*, and with a simplified notice." *Id*. (emphases deleted and added) OPM does not have authority to exempt agencies from applying retention order and preferences required by statute simply because they wish to eliminate an entire office or other "organization unit" or "combination of units." This concern is not hypothetical. In Executive Order 14210, "Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative," President Trump ordered all federal agencies to use large-scale RIFs to eliminate "all agency initiatives, components, or operations that my Administration suspends or closes." 90 Fed. Reg. 9669 (Feb. 11, 2025).

123. OPM's justifications for this new rule ignore its lack of authority to create such exemptions. OPM says that by requiring agencies to submit competitive area definitions to OPM, it has solved any problems. Thus, OPM points to ineffective "protections" against agency mischief that ignore the real problem: OPM is the proverbial fox guarding the henhouse. Where the administration intends to use RIFs to eliminate offices or programs that are contrary to the administration's political priorities, requiring OPM (which serves at the direction of the same

President) to review the request is not protection. Again, OPM's rule lacks statutory authority, is contrary to congressional direction, and is neither reasonable nor reasonably explained.

**Effects Of The Rules On Plaintiffs And The Employees They Represent**

124. AFGE, AFSCME, IFPTE, NFFE, and NTEU, on their own and in conjunction with their affiliated councils and locals, including in the case of AFGE the AFGE locals that are Plaintiffs, collectively represent more than one million of the approximately two million federal employees in matters relating to their employment in agencies and departments across the federal government.

125. AFGE, AFSCME, IFPTE, NFFE, NTEU, and their affiliates represent federal employees at agencies across the federal government who are subject to the new Suitability, Performance Appraisal, and RIF Process Rules.

126. AFGE, AFSCME, IFPTE, NFFE, NTEU, and or through their affiliates have in the past and will continue to frequently represent many employees subject to Chapter 75 adverse actions. Providing federal employees with representation when faced with adverse agency action is a core organizational function for each of these Plaintiffs and/or their affiliates. In light of OPM's own prediction of the number of Chapter 75 adverse actions converted to new OPM suitability actions, employees represented by AFGE, AFSCME, IFPTE, NFFE, NTEU, and their affiliates will certainly be subject to these new procedures and decision-making rather than action by the employing agency.

127. AFGE, AFSCME, IFPTE, NFFE, NTEU, and their affiliates represent federal employees at agencies across the federal government who are now subject to the altered systems for performance evaluation imposed by the Performance Appraisal Rule, under which they will be comparatively evaluated in violation of federal law. Providing federal employees with representation with respect to performance evaluations, including the systems for performance evaluation, is a core organizational function for each Plaintiff and/or its affiliates.

128. AFGE, AFSCME, IFPTE, NFFE, NTEU, and their affiliates represent federal employees at agencies across the federal government who are now subject to new procedures in

the event of RIFs, including veterans whose statutory retention preference is being eliminated, and employees who will be excluded from retention preference at all, either because they fall in a now excluded category or because their employing agency has taken advantage of OPM's large loophole permitting agencies to draw the boundaries of RIFs to eliminate retention preference altogether.

129. The employees who AFGE, AFSCME, IFPTE, NFFE, NTEU, and their affiliates represent will lose employment protections under the Suitability Rule, including being subject to adverse employment actions – whether designated as "suitability" actions or otherwise – without the protections they have been afforded in the past.

130. The employees who AFGE, AFSCME, IFPTE, NFFE, NTEU, and their affiliates represent will lose employment protections under the Performance Appraisal Rule, including by receiving worse performance evaluations than are justified by their performance.

131. The employees who AFGE, AFSCME, IFPTE, NFFE, NTEU, and their affiliates represent will lose employment protections in future RIFs under the RIF Process Rule, including by losing their positions as the result of application of these new rules and exclusions from retention preference.

132. The Sustainability Rule directly affects and interferes with the core activities of AFGE, AFSCME, IFPTE, NFFE, NTEU, and their affiliates in protecting the employees they represent from adverse employment actions.

133. The Performance Appraisal Rule directly affects and interferes with the core activities of AFGE, AFSCME, IFPTE, NFFE, NTEU, and their affiliates in protecting the employees they represent from unfair employee evaluations.

134. The RIF Process Rule directly affects and interferes with the core activities of AFGE, AFSCME, IFPTE, NFFE, NTEU, and their affiliates in protecting the employees they represent from unlawful RIF procedures.

135. Through their staff, AFGE, AFSCME, IFPTE, NFFE, NTEU, and/or their affiliates regularly advise their affiliates and/or officers on how to assist the employees they

represent in exercising their civil service rights under the law, including adverse action rights, the rights to challenge employee evaluations, and the RIF process. AFGE, AFSCME, IFPTE, NFFE, and NTEU have also expended and will continue to expend time and resources to respond to the Proposed and Final Rules at issue in this lawsuit.

136. AFGE, AFSCME, IFPTE, NFFE, and NTEU affiliates and the federal employees they represent have already reached out to AFGE, AFSCME, IFPTE, NFFE, NTEU, and/or their affiliates for support with respect to the Suitability Rule, the Performance Appraisal Rule, and the RIF Process Rule, or otherwise discussed the Rules.

137. Efforts to counteract the harms from the Final Rules are diverting employees and resources of AFGE, AFSCME, IFPTE, NFFE, and NTEU from otherwise being used to further their mission by organizing and representing employees, negotiating with employers, and advocating for improved employment conditions.

## CLAIMS FOR RELIEF

### Claim I:
### As To Suitability Rule
### Administrative Procedure Act, 5 U.S.C. §706(2)(A), (C)
### (Action Not In Accordance With Law And Exceeding Statutory Authority)

138. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

139. The federal employees Plaintiffs represent are subject to the Suitability Rule. Plaintiffs and the federal employees they represent are persons who have suffered legal wrong as a result of, and have been adversely affected or aggrieved by, the actions of OPM and its Director under 5 U.S.C. §702.

140. OPM is an agency and subject to the APA. 5 U.S.C. §701(a)(2), (b)(1). OPM's issuance of the Suitability Rule constitutes final agency action reviewable under the APA. 5 U.S.C. §704.

141. Under the APA, courts "hold unlawful and set aside agency action" that is found to be "not in accordance with law" (5 U.S.C. §706(2)(A)) or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" (5 U.S.C. §706(2)(C)).

142. The Suitability Rule is contrary to Congress' design in enacting the CSRA, including because it circumvents the protections applicable to adverse actions for employees under Chapter 75 and exceeds the authority granted to OPM by the CSRA.

143. Accordingly, the Suitability Rule violates the APA, 5 U.S.C. §706(2)(A), (C).

**Claim II:**
**As To Suitability Rule**
**Administrative Procedure Act, 5 U.S.C. §706(2)(A)**
**(Arbitrary And Capricious Agency Action)**

144. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

145. The federal employees Plaintiffs represent are subject to the requirements of the Suitability Rule. Plaintiffs and the federal employees they represent are persons who have suffered legal wrong as a result of, and have been adversely affected or aggrieved by, the actions of OPM and its Director under 5 U.S.C. §702.

146. OPM is an agency and subject to the APA. 5 U.S.C. §701(a)(2), (b)(1). OPM's issuance of the Suitability Rule constitutes final agency action reviewable under the APA. 5 U.S.C. §704.

147. The Suitability Rule is arbitrary and capricious, in violation of 5 U.S.C. §706(2)(A), as OPM did not consider the necessarily relevant and important aspects of the issues addressed by this Rule, including existing statutory provisions and restrictions, the needs or requirements of federal agencies engaged in employment decisions, and the reliance interests of affected employees, and the Rule was promulgated without any rational connection between the actions taken and the reasons given (or lack thereof), including because: (1) OPM's justifications for suitability actions instead of Chapter 75 adverse actions such as the need for debarment and to hold employees accountable are lacking explanation and support; (2) OPM's reliance on the

views of agencies is unfounded for reasons such as agencies' choice not to act against employees is not traced to Chapter 75 procedures and any agency frustration about not being able to take suitability actions against employees for post-appointment conduct misses that Chapter 75 actions are available; (3) OPM's claim that it is illogical to be easier to bar an individual from employment who has in the past committed a crime or engaged in misconduct than to take action against an individual who does the same thing as an employee ignores the logic behind granting greater civil service protections to employees than to applicants; (4) OPM does not adequately respond to concerns that the Suitability Rule will have an adverse effect on hiring and retention; (5) OPM claims without any evidence that the Suitability Rule will improve public confidence; (6) OPM has no explanation for how a Rule that results in excepted service employees having greater protections than competitive service employees is rational or is consistent with Congress' design; and (7) OPM does not justify the standardless nature of its authority to bring suitability actions, which will permit arbitrary enforcement.

**Claim III:**
**As To Performance Appraisal Rule**
**Administrative Procedure Act, 5 U.S.C. §706(2)(A), (C)**
**(Action Not In Accordance With Law And Exceeding Statutory Authority)**

148. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

149. The federal employees Plaintiffs represent are subject to the requirements of the Performance Appraisal Rule. Plaintiffs and the federal employees they represent are persons who have suffered legal wrong as a result of, and have been adversely affected or aggrieved by, the actions of OPM and its Director under 5 U.S.C. §702.

150. OPM is an agency and subject to the APA. 5 U.S.C. §701(a)(2), (b)(1). OPM's issuance of the Performance Appraisal Rule constitutes final agency action reviewable under the APA. 5 U.S.C. §704.

151. Under the APA, courts "hold unlawful and set aside agency action" that is found to be "not in accordance with law" (5 U.S.C. §706(2)(A)) or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" (5 U.S.C. §706(2)(C)).

152. The Performance Appraisal Rule's allowance of a standardized distribution system for appraising employee performance does not maximize accurate evaluations or the use of objective criteria, at least because the forced distribution is based on comparison to other employees, and is contrary to 5 U.S.C. §4302(c)(1). This remains the case even were the standardized distribution system to be limited to the two highest levels of employees because agencies would be required to differentiate between high-performing employees such that only some would get the highest ranking and the rest would only get the second highest ranking – even if the latter group previously would have also received the highest ranking and deserves that ranking under objective criteria.

153. The Performance Appraisal Rule's elimination of grievances over performance evaluations is inconsistent with 5 U.S.C. §7121.

154. Accordingly, the Performance Appraisal Rule violates the APA, 5 U.S.C. §706(2)(A), (C).

**Claim IV:**
**As To Performance Appraisal Rule**
**Administrative Procedure Act, 5 U.S.C. §706(2)(A)**
**(Arbitrary And Capricious Agency Action)**

155. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

156. The federal employees Plaintiffs represent are subject to the requirements of the Performance Appraisal Rule. Plaintiffs and the federal employees they represent are persons who have suffered legal wrong as a result of, and have been adversely affected or aggrieved by, the actions of OPM and its Director under 5 U.S.C. §702.

157. OPM is an agency and subject to the APA. 5 U.S.C. §701(a)(2), (b)(1). OPM's issuance of the Performance Appraisal Rule constitutes final agency action reviewable under the APA. 5 U.S.C. §704.

158. The Performance Appraisal Rule is arbitrary and capricious, in violation of 5 U.S.C. §706(2)(A), as OPM did not consider the necessarily relevant and important aspects of the issues addressed by this Rule, including existing statutory provisions and restrictions, the needs or requirements of federal agencies engaged in employment decisions, and the reliance interests of affected employees, and the Rule was promulgated without any rational connection between the actions taken and the reasons given (or lack thereof), including because: (1) There is no explanation of how it is possible to differentiate among employees who have equal performance when the forced distribution requires they be given different summary levels; (2) there is no proof that the asserted justification for forced distribution that high employee ratings are inflated is correct as opposed to that high employee ratings are deserved or have another cause; (3) OPM has not shown that forced distribution leads to more accurate and objective evaluations as opposed to more dispersed evaluations; (4) OPM justifies the exclusion of grievances on performance evaluations in part on the basis of conclusory assertions about the alleged unsuitability of arbitrators without any evidence; and (5) the elimination of higher-level management review for the lowest summary level is not adequately justified.

**Claim V:**
**As To RIF Process Rule**
**Administrative Procedure Act, 5 U.S.C. §706(2)(A), (C)**
**(Action Not In Accordance With Law And Exceeding Statutory Authority)**

159. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

160. The federal employees Plaintiffs represent are subject to the RIF Process Rule. Plaintiffs and the federal employees they represent are persons who have suffered legal wrong as a result of, and have been adversely affected or aggrieved by, the actions of OPM and its Director under 5 U.S.C. §702.

161. OPM is an agency and subject to the APA. 5 U.S.C. §701(a)(2), (b)(1). OPM's issuance of the RIF Process Rule constitutes final agency action reviewable under the APA. 5 U.S.C. §704.

162. Under the APA, courts "hold unlawful and set aside agency action" that is found to be "not in accordance with law" (5 U.S.C. §706(2)(A)) or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" (5 U.S.C. §706(2)(C)).

163. The RIF Process Rule is contrary to the statutory scheme for RIFs in 5 U.S.C. §§3501-04, and is therefore beyond the authority granted to OPM in 5 U.S.C. §3502 to create regulations implementing retention order and preference procedures, including because:

(a) The RIF Process Rule, including the retention standing and performance credit systems, violates the veterans' preference (5 U.S.C. §3502(b)-(c));

(b) The RIF Process Rule, including the retention standing and performance credit systems, and the exclusion of categories of employees from RIF coverage, violates the statutory requirement that OPM give "due effect" to "tenure of employment" and "length of service" in "regulations for the release of competing employees in a reduction in force" (5 U.S.C. §3502(a));

(c) The RIF Process Rule, including the exclusion of categories of employees from RIF coverage, violates the statutory requirement that the subchapter, including the retention order and preferences, must apply to "each employee in or under an Executive agency" unless "otherwise provided by this subsection and section 3504"; and

(d) The RIF Process Rule provisions permitting agencies to RIF entire offices or organization areas, or combinations thereof, without applying retention order and preference rules violates the statutory requirement of using rules that give due effect to enumerated factors for the "release of competing employees in a" RIF (5 U.S.C. §3502(a)). Accordingly, the RIF Process Rule violates the APA, 5 U.S.C. §706(2)(A), (C).

**Claim VI:**
**As To RIF Process Rule**
**Administrative Procedure Act, 5 U.S.C. §706(2)(A)**
**(Arbitrary And Capricious Agency Action)**

164. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

165. The federal employees Plaintiffs represent are subject to the requirements of the RIF Process Rule. Plaintiffs and the federal employees they represent are persons who have suffered legal wrong as a result of, and have been adversely affected or aggrieved by, the actions of OPM and its Director under 5 U.S.C. §702.

166. OPM is an agency and subject to the APA. 5 U.S.C. §701(a)(2), (b)(1). OPM's issuance of the RIF Process Rule constitutes final agency action reviewable under the APA. 5 U.S.C. §704.

167. The RIF Process Rule is arbitrary and capricious, in violation of 5 U.S.C. §706(2)(A), as OPM did not consider the necessarily relevant and important aspects of the issues addressed by this Rule, including existing statutory provisions and restrictions, the needs or requirements of federal agencies engaged in employment decisions, and the reliance interests of affected employees, and the Rule was promulgated without any rational connection between the actions taken and the reasons given (or lack thereof), including because: (1) OPM considered factors beyond those intended by Congress in elevating this administration's view of performance at the expense of other statutory factors in designing the retention standings and performance credit systems; (2) OPM failed to consider important factors Congress intended by discounting veterans' preferences, employee tenure, and length of service in designing the retention standings and performance credit systems and in excluding employees from coverage; (3) OPM considered impermissible factors and failed to consider important factors when exempting agencies from using retention preference and order when they define RIFs contiguously with a competitive area; (4) OPM's rule was issued without adequate consideration of problems created by elevating performance at the expense of other statutory factors in

designing the retention standings and performance credit systems, by excluding employees from RIFs, and by eliminating retention order and preference when an agency defines the scope of a RIF to eliminate all positions in a competitive area; (5) OPM failed to adequately consider employees' reliance interests in designing the RIF Process Rule; (6) OPM predicated regulatory changes on unsupported and incorrect criticisms of the then-existing regulations; (7) the choices made in the design of the RIF Process Rule do not match the rationales given; and (8) OPM failed to properly consider or analyze alternatives to the new rules.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs pray that this Court:

1. Declare that the Suitability Rule, the Performance Appraisal Rule, and the RIF Process Rule are not in accordance with law; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and arbitrary and capricious in violation of the APA;
2. Vacate, hold unlawful, and set aside the Suitability Rule, the Performance Appraisal Rule, and the RIF Process Rule under the APA;
3. Enter any stay or preliminary and permanent injunctive relief as warranted by law;
4. Award Plaintiffs their costs, reasonable attorneys' fees, and other disbursements as appropriate; and
5. Grant such other relief as this Court may deem just and proper.

DATED: October 19, 2026

Danielle E. Leonard
Liren Ma
ALTSHULER BERZON LLP
177 Post St., Suite 300
San Francisco, CA 94108
Tel.: (415) 421-7151
dleonard@altber.com
lma@altber.com

By: */s/ Danielle Leonard*

*Attorneys for Plaintiffs*

Jonathan Weissglass
LAW OFFICE OF JONATHAN WEISSGLASS
1939 Harrison Street, Suite 150-B
Oakland, CA 94612
Tel.: 510-836-4200
jonathan@weissglass.com

By: /s/ Jonathan Weissglass

*Attorney for Plaintiffs*

Elena Goldstein
Lesley Farby
(*Pro hac vice* applications forthcoming)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
Tel: (202) 448-9090
egoldstein@democracyforward.org
lfarby@democracyforward.org

By: /s/ Elena Goldstein

*Attorneys for Plaintiffs*

Rushab Sanghvi (SBN 302809)
Andres M. Grajales (admitted *pro hac vice*)
AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO
80 F Street, N.W.
Washington, D.C. 20001
Tel: (202) 639-6426
Sanghr@afge.org
Grajaa@afge.org

By: /s/ Rushab Sanghvi

*Attorneys for Plaintiffs American Federation of Government Employees, AFL-CIO (AFGE) and AFGE locals*

Teague Paterson (SBN 226659)
AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES, AFL-CIO
1625 L Street, N.W.
Washington, D.C. 20036
Tel: (202) 775-5900
TPaterson@afscme.org

By: */s/ Teague Paterson*

*Attorneys for Plaintiff American Federation of State County and Municipal Employees, AFL-CIO (AFSCME)*

Paras N. Shah
General Counsel
Allison C. Giles
Associate General Counsel
Lindsay Dunn
Assistant Counsel
(*Pro hac vice* applications forthcoming)
NATIONAL TREASURY EMPLOYEES UNION
800 K Street, NW
Suite 1000
Washington, DC 20001
Tel: (202) 572-5500
paras.shah@nteu.org
allie.giles@nteu.org
lindsay.dunn@nteu.org

By: */s/ Paras N. Shah*

*Attorneys for National Treasury Employees Union (NTEU)*